### MINCHEW et al. v. MORRIS et al.
### (No. 8657.)

(Court of Civil Appeals of Texas. Dallas. April 15, 1922.)

**1. Mines and minerals ⬤⟝74—Representation to the purchasers of lease as to what they could do in exploiting investment held not actionable.**

A representation to the purchasers of an oil lease that they could form a company and through it exploit the investment by selling stock so as to receive a large sum in excess of the purchase price, was an expression of a forecast of a future event, and not actionable.

**2. Mines and minerals ⬤⟝74—False statement to purchasers of lease that land is in "proven territory" held representation that oil existed on the lease and to be actionable.**

"Proven territory" means territory so situated with reference to known producing wells as to establish the general opinion that, because of its location in relation to them, oil is contained in it, and, where an oil lease is sold as being in proven territory, the conclusion arises that the land is within the confines of such territory, and that on the lease itself oil existed, and if such statement is falsely made and relied on by the purchasers seeking rescission it was actionable.

**3. Evidence ⬤⟝10(1)—Facts with reference to speculating in oil lands matters of judicial knowledge.**

Oil fields become definitely defined by boundaries established through the exploration of operators, so that those who are engaged in operating or speculating with reference to them rely upon a defined area as a known fact; but no particular area can be known to contain oil until the wells are actually drilled and oil discovered. These facts with reference to the pursuit of speculating in oil lands and producing oil are matters of judicial knowledge.

**4. Evidence ⬤⟝444(6)—Parol evidence admitted to show note became obligation only when stock sold.**

Where an oil lease was sold and a note given for the purchase price which was not to become binding until stock in a proposed company was sold and the proceeds applied to payment of the note, in an action on the note parol evidence was properly admitted to show that it was to become binding only upon sale of the stock.

**5. Cancellation of instruments ⬤⟝37(5)—Allegation that vendor of oil lease had no title or authority to convey for others sufficient to show no binding conveyance made by vendor.**

In an action to rescind the sale of an oil lease and restrain the collection of a note given for its purchase, allegations that the vendor had no title and was not authorized to convey for others were sufficient in effect to show that no binding conveyance was made.

**6. Mines and minerals ⬤⟝74—Doctrine of laches applied strictly to sale of oil leases against person seeking rescision.**

The doctrine of laches is applied with unusual strictness to contracts relating to the sale of oil leases against the person seeking rescision.

**7. Mines and minerals ⬤⟝74—Evidence held to sustain plea of laches in suit to rescind sale of oil lease for fraud.**

In a suit for rescission of the sale of an oil lease for fraud, evidence held to sustain a plea of estoppel by laches.

**8. Cancellation of instruments ⬤⟝34(1)—Rescission must be sought with promptness.**

Rescission, to be available, must be sought with promptness and diligence in any case; but what constitutes promptness depends upon all the facts and circumstances of each case.

**9. Mines and minerals ⬤⟝74—Greater diligence to avoid "laches" in rescinding sales of oil leases than in other transactions.**

While the law imposes the requirement of reasonable promptness in all cases to avoid laches, it requires greater diligence in seeking to rescind sales of oil leases.

**10. Equity ⬤⟝67—"Laches" defined.**

"Laches" is to be distinguished as consisting of negligence or omission to do, whenever it ought to be done, what the law requires to be done to protect a right which is presumed to have been abandoned because of such neglect or omission.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Laches.]

Appeal from District Court, Dallas County; E. B. Muse, Judge.

Action by Archie F. Morris and others against A. P. Minchew and others. From judgment for plaintiffs, defendants appeal. Judgment of rescission of contract reversed and rendered denying the same. Judgment in other respects affirmed.

Carrigan, Montgomery, Brittian & Morgan and Bert King, all of Wichita Falls, for appellants.

W. B. Hamilton, of Dallas, and Clark & Sweeton, of Greenville, for appellees.

HAMILTON, J. This is a suit for rescission of a contract conveying 2½ acres of land as oil property in Wichita county, Tex., for the cancellation of a promissory note given as part payment for the conveyance, and also

---

⬤⟝For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

for the recovery of $3,000, with interest, which was paid as a part of the consideration for the conveyance. Appellees, who were plaintiffs below, also sought an injunction against Minchew to restrain him from prosecuting a suit upon the promissory note in the district court of Wichita county, which suit appellees alleged to have been filed after the instant suit was instituted.

As the basis of recovery it was alleged that on or about the 16th day of January, 1919, two of appellants, Minchew and Wheeler, had an oil lease upon a certain tract of land in Wichita county; that these parties, claiming to own the lease with the right to transfer it, represented to appellee Morris that it was located in "proven territory," that, is, "territory that was proven to contain petroleum oil in paying quantities; that it was a sure thing and that if plaintiffs purchased said land they could form a company, and that, because of the fact that same was in such proven territory, they could capitalize said company at a sum largely in excess of the amount they were to pay him for the land and could easily sell the stock and make a splendid profit, not only upon the sale of the stock, but in the development of said property by drilling for oil thereon and developing same."

It was alleged that Minchew had had great experience in the oil business and owned large oil interests in that section; that Morris, because of his friendship for Minchew, who had been his boyhood friend, reposed the utmost confidence in him and relied upon his representations; that Minchew represented himself and appellee Wheeler to be the owners of the lease, Minchew having a power of attorney in fact to make a conveyance of the latter's interest as well as to convey his own interest; that by these representations appellees were induced to purchase the oil lease upon the land, paying the sum of $3,000 in cash therefor and executing a promissory note for the sum of $7,000, payable to appellant Minchew, dated January 16, 1919, and due February 15, 1919.

It was alleged that, while Minchew represented that he and Wheeler were the owners of the lease, in fact, appellant W. T. Cunningham was a part owner and jointly interested with the other appellants and bound and liable for the acts and representations of Minchew in the transaction between Minchew and appellees, as was also Wheeler; that Cunningham was claiming to be the owner of the note and demanding its payment; that, in consideration of the note and the aforesaid cash payment, Minchew, for himself and as attorney in fact for Wheeler, had executed a written transfer and conveyance of the lease upon the land to appellees, who, following Minchew's suggestions and advice, undertook to organize a company to develop the property; that after they en-

tered into this undertaking they learned the property was not in "proven territory," that it was in barren territory, and instead of being worth $10,000 it was not worth $3,000; that at the time of the payment of the money and the execution of the note, as well as at the time the representations were made by Minchew, it was already apparent and known to him and the other appellants, or by the exercise of ordinary diligence could have been known to them, that the territory described was barren and not producing territory; that it was incapable of being developed, and that appellees would lose practically all they paid for the property. It was further alleged that the representations were falsely and fraudulently made by Minchew; that they were relied upon by appellees, who were induced by them to pay the $3,000 and execute the described note. Tender of the cancellation and surrender of the lease was made.

It was alleged that for the purpose of injuring, vexing, and harassing appellees, Minchew, since the filing of this suit, instituted suit against appellees in the district court of Wichita county upon the $7,000 note above described. The prosecution of this suit for the above-stated reasons, as well as others, was sought to be enjoined.

By trial amendment appellees alleged that there was no consideration for the note described in their amended original petition, and that if there was any consideration it had failed, because Minchew had no title to the lease and was not authorized to assign and convey it, either in his own right or as attorney in fact for any one else. It was alleged that there was no consideration for the execution of the note, or, if any, it had failed for the additional reason that the property was represented to be "in proven oil territory and have oil in paying quantities therein and thereunder, whereas, in truth and in fact, said property was not in proven territory and there was not any oil, gas, or other mineral thereon or thereunder in paying quantities."

It was also alleged in the trial amendment that the note was not delivered as a binding obligation, but was put into the hands of Minchew with the understanding that it was not to become a binding obligation unless the property should be in proven territory with oil thereon and thereunder in paying quantities, and not until and unless a joint-stock company or trust company should be successfully organized and the stock sold so that a sufficient sum should be realized from such sale to pay the note. In that connection it was alleged that Minchew agreed to organize, manage, and assist in managing and controlling such joint-stock or trust company, and that the note was not to become a binding obligation until such contingencies and conditions had transpired.

Appellants answered by general demurrer and by special exceptions. The first special exception invoked the proposition that the petition pleaded a cause of action based upon representations of opinion and not of fact, for which reason it was insufficient. The second special exception was directed at the portion of the trial amendment alleging that the note was executed and left in the possession of appellants with the understanding that it was not to become a binding obligation unless the property sold should be "proven territory," the pleading in this respect alleging a verbal understanding without any allegation sufficient to sustain it with reference to varying the written contract made, and there being no pleading that the written contract was made through mutual mistake or fraud, and that such allegation constituted an attempt to vary the terms of a written instrument by parol agreement. The third special exception assails the petition on the ground that the allegation to the effect that the title had failed was uncertain and indefinite.

Appellants also answered by general denial and specially pleaded estoppel on the ground that appellees were guilty of laches because of their failure promptly to repudiate the contract and seek rescission upon making discovery of the alleged fraud and misrepresentation. By cross-action appellants sought recovery upon the note.

Judgment was rendered for appellees, plaintiffs below, as follows: All the exceptions were overruled. It was decreed that appellees should recover judgment for the sum of $3,000, that the $7,000 note above described should be canceled and delivered to appellees, and that all the appellants should be perpetually enjoined from prosecuting this suit in Wichita county.

As appears from a summary of the allegations above recited, we think it manifest that the general demurrer ought not to have been sustained.

[1] The first assignment of error is that the court erred in overruling it for the reason that the petition alleged misrepresentations as to matters of opinion only and was not sufficient to allege that the misrepresentations were as to matters of fact. The allegation to the effect that appellants represented that appellees could form a company and, through it, exploit the investment by selling stock so as to receive a sum largely in excess of the amount paid and thereby make a profit, we think very clearly alleges only expressions of opinion about a matter as to which appellees must have known appellants could have no definite knowledge. Such statements could not be understood to have greater force than or extend beyond the realm of mere speculation. The statements alleged necessarily were expressions of a forecast of a prospective future event, the very nature of which excluded the idea that appellees could have believed it to be, and relied upon it to be, a statement of an actual fact.

[2, 3] That portion of the petition, however, which alleges that Minchew represented the lease to be in "proven territory" describes, not an expression of an opinion, but a representation of a situation as a known fact. The allegation that Minchew fraudulently made this representation, connected with the allegation of his expansive experience with reference to oil territory, and that disclosing Morris' complete ignorance of oil fields, were sufficient to set forth the deceit and misrepresentation in the form of a statement of fact. Oil fields become definitely defined by boundaries established through the exploration of operators so that those who are engaged in operating or speculating with reference to them rely upon the defined area as a known fact. The expression "proven territory" has a fixed meaning in the business. Experience in Texas oil fields has diffused a general understanding of its meaning which conveys a definite idea. It means territory so situated with reference to known producing wells as to establish the general opinion that, because of its location in relation to them, oil is contained in it. Of course, no particular area can be known to contain oil until the wells are actually drilled and the oil is thus discovered. Such are the uncertainty, irregularity, and elusiveness which characterize the deposit of oil lying beneath the surface in the average oil field that barren areas are not infrequently found to exist in what is regarded as proven territory. All these facts with reference to the pursuit of speculating in oil lands and producing oil are matters of judicial knowledge because of the universality with which they are known and acted upon in this state.

The alleged misrepresentations were not that the land certainly contained oil. The effect of the allegations was that the representations were that the land lay within the confines of proven territory, from which statement the conclusion naturally would spring that on the lease itself oil existed because of its being in proven territory. Such conclusion would naturally result from a statement of this character if confided in, and, if the statement was falsely made, of course the purpose of making it was to create an erroneous conclusion founded upon deceit, and which would not have been arrived at except for the representation of the existence of a fact which Minchew knew did not exist, or was in a position to learn was nonexistent. The petition, accordingly, disclosed more than the expression of an opinion as the inducement which actuated Morris. It alleged the inducement to be a fraudulent misrepresentation embodying the state-

ment of the existence of a certain condition as a fact.

The above disposes of the general demurrer and first special exception.

[4] The second special exception was also properly overruled. The effect of the allegation with reference to delivery was that only one element of delivery had taken place. That is, that while possession and custody of the note had been reposed in appellant Minchew, yet such manual possession did not pass with the intention of creating legal obligation, which is the other essential element of a valid delivery, but that whether or not it was to become a legal obligation depended upon the contingency that the stock company should be formed and stock sold to the extent that the proceeds of it should be sufficient to pay the obligation. Under the allegations, until this subsequent event happened, the mere possession of the instrument by Minchew did not constitute it a binding obligation against appellees, and, under the general rule recognized by the authorities, parol evidence was admissible, not to vary the terms of the instrument, but to show that it was to become a binding obligation only upon the accomplishment of the sale of stock in the organization to be effected. L. R. A. 1917C, 306 et seq.; Hawkins v. Johnson (Tex. Civ. App.) 181 S. W. 563.

[5] The third special exception was properly disposed of by the court. Allegations that Minchew had no title to the property and that he had no proper authority to make a conveyance for others were sufficient, in our opinion, to allege in effect that no binding conveyance was made by Minchew.

[6] The most serious matter presented in this appeal is the question of laches invoked as a defense by appellant. We take it as well established that the doctrine of laches is to be applied with unusual strictness and severity to contracts relating to the sale of oil leases against the person seeking rescission. This is because of the uncertain and fluctuating value of property of this nature. Experience and observation teach that an oil lease may be worth thousands of dollars to-day and to-morrow may be deemed as worthless, and that, on the other hand, a lease which may be of little value at a given time within a short period may be transformed into one of fabulous value because of operations on adjacent and surrounding territory which develop oil wells and establish such lease as proven territory..

[7] The undisputed facts clearly disclose to us that appellees knew the conditions with reference to the lease being in unproven territory within a few days after the transaction with Minchew as well as they knew it at the time the suit was filed.

The witness R. B. Rutherford, who testified in behalf of appellees, stated that he made a personal visit to the property some time in February, 1919, and found that a certain well called the "Meyers-Humble well," which was a considerable distance from the lease involved in this suit, was generally accepted by oil men as the boundary of dry territory. He testified as to what was meant by proven territory, and stated that it was territory beyond which a producing well had been brought in. He testified that there never had been a producing well within a quarter of a mile of the 2½ acres in that territory. All of these facts he communicated to appellees as soon as he learned them.

Correspondence passed between Morris and Minchew during a period of several months after Morris had this information. On the 21st of March, 1919, Morris wrote Minchew a letter concerning the sale of stock and deplored his failure to effect sales. Nothing was said to indicate that he had been defrauded or misled by any misrepresentations on Minchew's part. On March 27, 1919, Minchew answered this letter and discussed the means of Morris effecting a sale of stock. He also referred to a great slump in all stocks which occurred shortly after the purchase. In reply to that letter, Morris wrote to Minchew on the 29th day of March and stated that, while he acted entirely upon Minchew's suggestion as his friend, he was not at all sorry that he did. He made inquiry as to what the lease would sell for, reassured Minchew that he had not abandoned the undertaking to sell the stock, or, to use his words, that he had not "laid this proposition down," and recited that he was willing to do everything in his power to "get it across." He also inquired whether or not Minchew deemed it best to sell the lease for what it cost. He made various inquiries in this letter, but there was no intimation that any fraud had been perpetrated or that he desired to rescind because of fraud or misrepresentations. On the 9th day of April he replied to a letter written by Minchew on the 4th day of that month and expressed disappointment on being advised by Minchew that the lease at that time was worth a third less than when it was sold to Morris and his associates. He expressed regret over the fact that he could not sell stock, and stated that he did not know how to start another venture "in putting over this company." He proposed to act upon the suggestion that the property was worth one-third less than it was at the time of the purchase and take $2,000 for the $3,000 cash which had been paid, returning the lease to Minchew. He referred to the "oil fever," expressing the belief that it would return and make it possible for Minchew to make money. On the 14th day of April, 1919, he answered a letter written by Minchew on the 12th day of that month and stated in that letter that he felt "just as keenly the business

obligation as he did the day he took hold of same," and assured Minchew that as soon as the stock was sold in the company he would take up the note. In reply to that letter, Minchew, on April 16, 1919, for the first time explicitly stated that he expected payment of the note regardless of whether or not stock was sold, and asserted that the contract was that 75 per cent. of the receipts from the sale of stock was to be applied on the payment of the note as the stock was sold in order that the indebtedness against the property might be liquidated before ownership had passed to other persons by sale of the stock. Upon the receipt of this letter it seems that Morris employed attorneys and began to take steps to compel rescission of the contract.

At the time the case was tried it appears that developments had rendered the lease practically worthless. The testimony, as a whole, indicates that it was constantly and rapidly declining in sale value from the time Morris admits he obtained the true facts with reference to it some time in February, 1919.

Such being the facts, generally stated, we believe that as applied to a transaction of the nature involved in this suit, relating to a business in which the element of time is of higher importance than in any other business, it is fairly established that appellees' negligence and omission to act promptly upon discovering the asserted fraud rendered their conduct vulnerable to the plea of estoppel by laches. In our opinion the most indulgent consideration of the evidence discloses it to be insufficient to establish a right of rescission in the face of the facts sustaining this plea.

[8-10] Rescission, to be available, must be sought with promptness and diligence in any case; but what constitutes promptness depends upon all the facts and circumstances of each particular case. In trades involving property the value of which is fixed and free from fluctuation, the lapse of a comparatively long period of time after the discovery of the fraud may not afford any basis for the plea of estoppel by laches. In fact, the mere running of time is not of itself a determinative element of laches as it is of the legal defense of limitation. Laches is to be distinguished as consisting of negligence or omission to do, whenever it ought to be done,

what the law requires to be done to protect a right which is presumed to have been abandoned because of such neglect or omission. Black on Rescission, § 541. But, while the law imposes the requirement of reasonable promptness in all cases to avoid laches, it requires greater diligence and activity in seeking to rescind transactions with reference to oil values affected by extraordinary uncertainty and fluctuation, as they are, than with reference to ordinary dealings. Twin Lick Oil Co. v. Marbury, 91 U. S. 592, 23 L. Ed. 328.

Notwithstanding that rescission is to be denied appellees in this case, yet that portion of the judgment of the court decreeing cancellation of the note under the record we regard as being fully sustained. This issue was disposed of with reference to the cross-action seeking recovery upon the note in connection with the allegations of appellees' petition to the effect that there was no such delivery as to constitute it a valid and binding obligation. The evidence, while conflicting as to what the agreement was bearing upon this portion of the transaction, is abundantly sufficient to sustain the finding that the agreement was that contended for by appellees. The court, in effect, having found that the note was to be a binding obligation and to be paid only in the event a company should be organized and stock sold, and the evidence strongly supporting this finding, and further clearly establishing the fact that, because of the worthlessness of the lease from an oil standpoint, such stock can never be sold, that part of the judgment canceling the note must be upheld.

The record contains many assignments of error which we have considered, but which we think it unnecessary to discuss, for the reason that what we have said above comprehends what we regard as being essential to a discussion of the judgment by which we dispose of the case. The effect of the views above expressed is to leave the respective parties where they put themselves, and to place the fiat of approval upon the transaction which the record discloses to have been made by them.

That portion of the judgment decreeing a rescission of the contract is reversed, and judgment is rendered denying rescission. The judgment in all other respects is affirmed.