### WATCHORN v. ROXANA PETROLEUM CORPORATION.*

(Circuit Court of Appeals, Eighth Circuit. March 7, 1925.)

No. 6471.

**1. Money received ⚖➝6(4)—Partial breach not ground for rescission.**

Where one party has parted with valuable rights under a contract, his failure to fully perform in all respects does not give the other party the right to rescind and recover the original consideration as money had and received.

**2. Contracts ⚖➝261(4)—Contract cannot be rescinded for breach of a covenant incidental to its main purpose.**

Where a contract is substantially executed, it cannot be rescinded for breach of a covenant incidental to its main purpose.

**3. Money received ⚖➝18(1)—Action to recover consideration on rescission is governed by equitable principles.**

An action for money had and received to recover on rescission the consideration of a contract, while in fact a law action, is governed by equitable principles, and the burden is on plaintiff to show that he is entitled in equity, justice, and good conscience to the money.

**4. Mines and minerals ⚖➝74—Party held not entitled to rescind and recover consideration paid for assignment.**

Plaintiff paid defendant $250,000 for an assignment of his oil rights in twelve tracts of land, with the option of acquiring such rights by the payment of $750,000 additional. The contract provided that at the end of six months plaintiff might notify defendant that it would proceed no further and reassign the interests and leases, in which case it should be entitled to reimbursement for the sum paid out of 50

*Rehearing denied July 31, 1925.

per cent. of the first net proceeds of gas sold from the tracts, which defendant agreed to "duly and properly develop," for gas, but he was not to be otherwise liable for the repayment. After the six months, plaintiff elected not to proceed further and made the reassignment. Held, that the main purpose of the contract was the acquiring of the option on the oil rights; that the provision for reimbursement in case the option was not exercised was merely incidental; and that the failure of defendant to drill wells for gas on each and all of the twelve tracts, where, in the opinion of experienced men and experts, no profitable production could be obtained, did not give plaintiff the right to declare the contract rescinded and recover the $250,000 from defendant as money had and received.

**5. Mines and minerals ⚖➝74 — Remedy for breach held not rescission, but action for damages.**

The right to reimbursement in case the option was not exercised under such contract was not absolute, but contingent, as to both the right and the amount on the gas production, and the only obligation of defendant in respect thereto was to take due and proper means in good faith to develop that production; and for his failure to do so plaintiff's remedy was by an action for damages for breach of contract.

**6. Mines and minerals ⚖➝74—Requirement to "duly and properly develop" land for gas, stated.**

A provision of a contract requiring defendant to "duly and properly develop" for gas certain described lands, consisting of twelve separate tracts, in the production of which both parties had an interest, did not require him to drill wells on each and every tract, regardless of probable returns, but relates to the entire tract, considered as an entity, and means such reasonable development taking into consideration the relationship of the parties to each other and all the circumstances surrounding and involved in the entire transaction, as would be expected of prudent, skillful, and experienced operators.

In Error to the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Action at law by the Roxana Petroleum Corporation against Robert Watchorn. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Roxana Petroleum Corporation (designated for convenience, in this opinion, as plaintiff) brought action in the United States District Court for the Western District of Oklahoma against Robert Watchorn (designated hereafter as defendant) to recover the sum of $250,000 claimed to be due under the terms of a written contract made between plaintiff's assignor and defendant, relative to certain oil and gas mining rights owned by defendant in Oklahoma. A jury was

waived by agreement of the parties, and the case tried to the court, resulting in a judgment against defendant for $239,470.06, being the $250,000 claimed, less amounts credited, received from sales of gas developed on the premises.

The Roxana Petroleum Company, a corporation under the Oklahoma laws, predecessor in interest of the plaintiff, on June 30, 1916, entered into a contract with defendant, he being the owner in whole or in part of oil and gas mining rights in certain premises situated in Pawnee county, state of Oklahoma, by the terms of which defendant agreed to sell, transfer, assign, and set over by suitable instruments unto the plaintiff all his right, title, and interest in and to the crude petroleum that might be found in or under said premises. In consideration of this transfer and assignment and in payment for the sale of said crude petroleum and the right to explore for and extract the same, plaintiff's assignor was to pay to defendant $1,000,000 in the manner set forth in the contract, viz., $250,000 simultaneously with the execution of the contract by giving ten promissory notes in the sum of $25,000 each, due three years from date, bearing interest at 6 per cent. Thirty other promissory notes for $25,000 each, bearing even date with the contract, payable to the defendant on or before three years, with interest from January 1, 1917, at the rate of 6 per cent. per annum, were also to be signed and delivered in escrow to the Security National Bank of Oklahoma City, Okl.

On January 1, 1917, under the terms of the contract plaintiff's assignor had the right:

"(a) To pay said sum of seven hundred fifty thousand dollars ($750,000.00) in cash, or to have said notes delivered to the party of the first part.

"(b) Or * * * to advise the party of the first part, either in person or by registered mail addressed to him at Oklahoma City, Okl., that party of the second part will proceed no further with this agreement; and in that event the said notes so held in escrow shall be redelivered to the party of the second part by the said Security National Bank."

The contract also provided that if the plaintiff's assignor exercise option B above set out, to end the matter, the interests in the oil leases which defendant was to assign to plaintiff's assignor should be reassigned to him. The Roxana Petroleum Company transferred to plaintiff all its rights under said contract, and at the time suit was commenced plaintiff was owner thereof. The contract is an extended one with many provisions which need not be especially referred to, except as to those around which this controversy rages, viz.:

"In the event party of the second part shall elect to proceed under subdivision (b) aforesaid—that is to say, to make the reassignments hereinabove referred to and retake possession of said thirty (30) notes aforesaid—then the second party shall also be entitled to be reimbursed for the payment of said two hundred fifty thousand dollars ($250,000.00) made as herein appears, out of the first fifty per cent. (50%) of any receipts, after the rentals and royalties have been deducted, obtained from any and all gas sold from the premises above described. In order that second party may be reimbursed in the said sum of two hundred fifty thousand dollars ($250,000.00) it shall be the duty of the first party to duly and properly develop said lands for gas, and in due course dispose of said gas, and to keep a correct record of any and all receipts therefrom. This provision for reimbursement out of fifty per cent. (50%) of the proceeds from the sale of gas shall not be operative until all of the said notes for two hundred fifty thousand dollars ($250,000.00) shall have been fully paid.

"It is further agreed that in the event the right to reimbursement to the second party of said two hundred fifty thousand dollars ($250,000.00) shall accrue as herein provided, that no liability shall accrue or exist against the first party to make such repayment except out of the production and sale of gas as herein provided, and not otherwise. First party, however, agrees not to sell his gas rights in and to said property and premises in bulk, without a proposition in the assignment and sale thereof for said possible right of reimbursement of said two hundred fifty thousand dollars ($250,000.00) out of the proceeds of such sale; but it is understood and agreed that if the said notes shall not have been fully paid, the right to the reimbursement shall be suspended and inoperative until all of the notes shall have been fully paid."

This contract covered twelve different parcels of land, not contiguous, but all in the same oil field known as the Morrison or Otoe field, and provided for a certain test well to be drilled on one of the 40-acre tracts, and also other test wells sufficient in the opinion of plaintiff's assignor to make a thorough test for oil.

Pursuant to the contract, the Roxana Petroleum Company delivered its notes to defendant for $250,000, which were paid on January 29, 1917. On January 1, 1917, defendant was notified that no further proceedings under the contract would take place, and the leases were reassigned to defendant. Plaintiff took back from escrow the $750,000 of notes hereinbefore referred to.

Defendant on February 10, 1917, assigned his interest in a portion of said lands and premises to the Watchorn Oil & Gas Company, a corporation, subject to the rights of Roxana Petroleum Company, by virtue of the contract with it for a possible reimbursement of the $250,000 out of the sales of gas developed from the lands.

At the time the contract between the plaintiff's assignor and the defendant was entered into, the discovery well known as Miller No. 1 had been drilled on the southwest quarter of the southwest quarter of section 33, township 22 north, range 3 east, being land covered by the contract, and in which the Fortuna Oil Company had a one-half interest. After the signing of the contract, the well known as Miller Well No. 2 was drilled by defendant or his assignee on the north one-half of the southwest quarter of said section 33. Negotiations were entered into with the Oklahoma Natural Gas Company to get a pipe line into the field to take the gas from Miller Well No. 1, but such pipe line was not secured until December 17, 1917. These two wells have produced gas, and plaintiff's share thereof amounted to $10,528.94, which is held by the Oklahoma Natural Gas Company for plaintiff, and was credited by the court on the $250,000 and interest found due to plaintiff. It should be stated that defendant or its assignee made attempts to drill a number of other wells on the southwest quarter of section 33, but they were not successful as gas wells. There was no development on any of the other parcels of land covered by the contract.

The amended petition upon which the case was tried is in three counts, the first alleging that more than a reasonable time has elapsed within which, under the contract, the defendant agreed to duly and properly develop the lands for gas, and that defendant refuses to reimburse the Roxana Petroleum Company or the successor in interest of said company and assignee of its assets and rights, in the sum of $250,000 or any part thereof, although demand has been made upon defendant by plaintiff and by plaintiff's assignor.

The second count is substantially the same.

The third count is based on the disposal by said defendant of his interest in portions of said tracts of land, plaintiff claiming that thereby defendant put it out of his power to fulfill the terms of the contract made with plaintiff's assignor to duly and properly develop all of said lands for gas; and seeks to recover the sum of $250,000 claimed to be advanced to defendant by plaintiff's assignor.

Defendant demurred to the amended petition on the ground that each and every count failed to state facts sufficient to constitute a cause of action. The demurrer was overruled. Defendant filed answer, claiming it had made all the development required by the contract. Certain findings of fact were made by the court nunc pro tunc on May 30, 1923, which were subsequently set aside, and other findings of fact nunc pro tunc as of March 1, 1923, were made July 24, 1923, after the term of court had expired. The facts being practically without dispute, the question of whether the findings of fact of July 24, 1923, can be considered by this court, is unimportant.

The record presents 89 assignments of error, many of them, however, presenting similar questions.

Cleon Headley, of St. Paul, Minn., and John Embry, of Oklahoma City, Okl. (Embry, Johnson & Tolbert, of Oklahoma City, Okl., and Davis, Severance & Morgan and C. A. Severance, all of St. Paul, Minn., on the brief), for plaintiff in error.

John J. Yowell and Truman P. Young, both of St. Louis, Mo. (Koerner, Fahey & Young, of St. Louis, Mo., on the brief), for defendant in error.

Before SANBORN and KENYON, Circuit Judges, and BOOTH, District Judge.

KENYON, Circuit Judge (after stating the facts as above). Plaintiff claims the contract was an agreement upon the part of defendant to reimburse plaintiff's assignor in the amount of $250,000 out of a fund to be created by due and proper development for gas of the various tracts of land covered by said contract, in case plaintiff did not complete the purchase of the oil rights as provided therein; that defendant failed to make such development, and consequently is liable for the full amount of the $250,000 paid to him under the terms of the contract.

Defendant claims that the contract created no debt as to him; that the $250,000 was in fact paid for an option to secure the oil rights in the premises, and not advanced for

the purpose of developing gas; that the production of gas is the contingency upon which any obligation of defendant to pay rests; that is not an agreement to develop or repay as an alternative; that defendant's agreement is to duly and properly develop the lands for gas, and that if he has failed so to do plaintiff's action should be one for damages based on breach of contract and not to recover the $250,000; that the $250,000 could be recovered only if plaintiff shows that, had defendant made proper development of the premises for gas, funds would have been derived therefrom, out of the first 50 per cent. of which, less rents and royalties, plaintiff could have paid said amount to defendant. There was no effort made in the case so to do.

The court held that the contract was an obligation to develop the premises for gas as a means of repaying the plaintiff money paid to defendant; that nothing less than actual drilling on each parcel of land covered by the contract would constitute a compliance therewith. It refused to permit the defendant to introduce evidence of experts as to what in their judgment would be due and proper development of the lands for gas; and held that it was not necessary for plaintiff to prove damages; that the evidence failed to show due and proper development; and that the whole sum of $250,000 paid to defendant by plaintiff's assignor under the terms of the contract, by virtue of defendant's failure to make such development, became a debt due and owing to plaintiff from defendant. The court's view of the construction of the contract is clearly shown in a discussion between the court and counsel as follows:

"By the Court: I think that is clear now, and that testimony is refused. In other words, this contract requires development, and it seems to me that without actual development you didn't perform the contract.

"By Mr. Johnson: In view of that statement, what should we have developed?

"By the Court: All of this land.

"Mr. Johnson: We should have drilled a hole on each of the tracts of land?

"By the Court: Certainly. No one could know whether gas was on any tract of land without development. You can't take the plaintiff's money and keep it and say that it wouldn't have been of any value to develop this land and rested at that. You are required to develop the land. I think your offer is complete." (Record, p. 225.)

Some controversy is suggested in argument as to the theory on which recovery is sought. During the progress of the trial, question arising as to this, counsel for plaintiff stated:

"Mr. Young: Your honor, during Mr. Embry's argument it occurred to me there was some confusion regarding this matter. We are not suing here for an accounting. We are not suing for what that contract entitled us to if we conceived that Mr. Watchorn complied with his contract. We are suing for failure to comply, and therefore we say there is an absolute obligation to pay the full amount now."

In discussing the nature of defendant's liability, counsel for plaintiff, on page 115 of their brief, state: "Where one has received money upon the faith of a contract which he thereafter fails to perform, the party who has advanced the money has the right to rescind the contract and sue for the money so paid. The law in such case creates an implied contract or obligation to return the money." And again, on page 117 of the brief: "Cases, therefore, which deal with the subject of the defendant's right in case of a breach of contract, to recover the consideration paid on rescission of the contract, or to sue for damages on affirmance thereof, have no bearing upon the specific question presented here." A number of times it is claimed in plaintiff's brief that this is a suit for money had and received. Possibly plaintiff's theory is best expressed by the statement, on page 119 of its brief, as follows: "The defendant having received the money and having failed to perform the contract, the law will create the implied obligation to return it, and a suit in the nature of a common-law action in assumpsit may be maintained. The plaintiff in such a case does not have to rely upon any specific provision in the contract making the defendant personally liable for the debt; the law creates the liability on account of defendant's failure to perform his part of the contract. This would be true even if the $250,000 obligation had not arisen out of an actual advancement of that sum." Again, page 120: "That being so, it is certainly clear that this implied obligation will arise upon defendant's breach of contract where he has actually received the money sued for and has agreed that said money shall be returned out of a fund to be created by him."

The nature of the action is important as bearing on the legal principles to be applied. This suit cannot succeed as an action upon a rescission of the contract to recover the original consideration as money had and received, for a number of reasons, viz.:

[1] (a) Plaintiff's assignor received, and defendant parted with, valuable rights under the contract. For six months plaintiff or its assignor had the privilege of experimenting on, and testing, the lands to see whether oil could be developed. Defendant was excluded from making any arrangements with regard to said property as to oil or gas rights from June 30, 1916, to January 1, 1917. The $250,000 would have been a part of the purchase price for the oil rights if the option to take them had been exercised by the payment of $750,000 additional. Whatever the rights secured by this payment may be designated, they were in the nature of an option or a payment for the privilege of securing an option, and were of possible great value. The letter, Exhibit A in the record, from Mr. Gracht, representing and authorized to speak for the Roxana Petroleum Company, to Mr. Watchorn, throws light, not only upon the supposed value of the gas rights, but also upon the nature of the contract it was intending to make. In it appears this:

"On a payment of $250,000.00 cash made within one week after the acceptance of this agreement, Roxana Petroleum Company shall receive an option to purchase the oil rights on the leaseholds above referred to, with the exception of the E. ½ of N. W. ¼ of 4—22—3 E. (which 80 acres is wholly excluded from this deal), for an additional payment in cash of $750,000, to be exercised within six months from the date of acceptance of said option." (Record, p. 41.)

The word "option" is used also with reference to an additional payment of $1,500,000 to cover both oil and gas rights, instead of the $750,000 as follows: "It is understood that in case we exercise either of these options, you will not during the six months provided for taking it up enter into any contract or agreement regarding the gas produced from said premises." Again in said letter it is stated, "It is agreed that in case we exercise the above option by Saturday next." At other places through the letter the frequent use of the term "option" is found. The money certainly was not paid by plaintiff's assignor for development of gas, and while it is not possible to determine what part of the consideration was given for the right to secure an option as to oil, it is apparent that was the important part thereof. The purpose of the negotiations and contract on the part of plaintiff's assignor was to secure oil rights if, in its judgment, they were sufficiently valuable, and to reap profit therefrom.

In view of the fact that the contract had been partially executed and plaintiff or his assignor had received substantial benefit therefrom, that defendant had done his part thereunder, at least outside of the question of due and proper development, and parted with valuable rights which plaintiff could not return, in other words, could not place him in statu quo, there could be no rescission because of defendant's failure to completely perform his contract. German Savings Inst. v. De LaVergne Refrigerating Mach. Co. et al., 70 F. 146, 17 C. C. A. 34; Gile v. Inter-State Motor Car Co., 27 N. D. 108, 145 N. W. 732, L. R. A. 1915B, 109. See authorities note, 30 L. R. A. 33.

[2] (b) The duty to develop for gas is a covenant incidental to the main consideration of the contract. The $250,000 was paid as a part of the purchase price of the oil rights if the deal was consummated. It was not to be returned, except upon the happening of a certain contingency and in a certain way. The right to discover whether oil was on these premises in sufficient quantities to pay for developing was exercised by the plaintiff. That part of the contract was substantially performed. The right to be reimbursed out of the gas production was subordinate, incidental, and contingent, and it is well established that where a contract is substantially executed it cannot be rescinded for breach of covenant incidental to its main purpose. The remedy is recovery of damages for the breach. Howe v. Howe & Owen Ball Bearing Co. et al., 154 F. 820, 83 C. C. A. 536; Kauffman v. Raeder et al., 108 F. 171, 47 C. C. A. 278, 54 L. R. A. 247; Neenan v. Otis Elevator Co. (C. C.) 180 F. 997; Oscar Barnett Foundry Co. v. Crowe, 219 F. 450, 135 C. C. A. 162.

[3] (c) An action for money had and received to recover upon rescission the consideration of a contract, while in fact a law action, is governed by equitable principles, and to recover the burden is on plaintiff to show that it is entitled in equity, justice, and good conscience to the money. Howe v. Howe & Owen Ball Bearing Co. et al., 154 F. 820, 83 C. C. A. 536; Sanford v. First Nat. Bank of Marysville, Kan., et al., 238 F. 298, 151 C. C. A. 314; Bradley Lumber Co. v. Bradley County Bank et al., 206 F. 41, 124 C. C. A. 175; Board of Com'rs of Kay County, Okl., v. Pollard-Campbell Dredging Co., 251 F. 249, 163 C. C. A. 405; Lipman, Wolfe & Co. v. Phœnix Assur. Co., Ltd., 258 F. 544, 169 C. C. A. 484; 27 Cyc. 849–854.

[4] While the equities may be with plaintiff in its effort to prevent defendant keep-

ing the entire $250,000, there is a lack of equity in insisting that defendant must drill on every one of the twelve parcels of land, regardless of expense, which may run into hundreds of thousands of dollars, or pay to plaintiff $250,000, even though experienced operators and experts might testify, if permitted, that there was little or no gas in the tracts of land not drilled, thus giving to plaintiff the right to prospect for oil on the premises and the opportunity to perhaps acquire large and profitable returns therefrom, without being obligated to pay therefor any consideration whatsoever, leaving defendant with his discredited leases in the market place, and no compensation whatever for the rights and privileges extended to plaintiff. Such a situation does not appeal to the equity side of a court. As the action, for the reasons stated, cannot be sustained on any theory of rescission of contract and recovery of the consideration therefor as money had and received, we pass to other theories.

[5] Plaintiff's position seems to be that this is not an action for damages for breach of the contract, but is one to recover the $250,000 under the provision of the contract for reimbursement. On page 119 of the plaintiff's brief it is stated: "In this case the suit is not a suit for damages; it is a suit for money had and received." It is urged that under the contract there is an obligation, either express or implied, on the part of defendant, to create a fund out of which the alleged $250,000 advancement is to be repaid to plaintiff's assignor, and that defendant by failing to develop the property for gas, as agreed in the contract, becomes liable therefor the same as if a sufficient fund had in fact been created by defendant out of which it could be paid. We refer to some of the cases cited in support of this theory.

In Empire Gas & Fuel Co. v. Pendar (Tex. Civ. App.) 244 S. W. 184, 186, the consideration of the contract was $60,000 for certain leased interests, to be paid, $5,000 cash; $25,000 in promissory notes; and $30,000 "in oil to be produced from the leased premises by lessee if the same is so produced." Pendar agreed to pay $60,000. If the $30,000 payable in oil was not produced from the premises, the debt still existed. In the Pendar Case the obligation to pay is a definite one. Here the obligation is to develop the lands. There the debt is definite. Here the debt is contingent. No obligation to pay comes into being unless a fund arises from the sale of the gas production.

Blight v. Ashley et al., Fed. Cas. No. 1,-

5 F.(2d)—41

541, is cited by plaintiff. In that case there was proof made of damages, as defendant here claims must be done. The recovery of the full amount of the debt was not permitted. We see nothing in the case sustaining plaintiff's position.

A leading case cited in many of the decisions is Nunez v. Dautel, 86 U. S. 560, 562, 563, 22 L. Ed. 161. The provision there productive of controversy was as to payment being made as soon as the crop could be sold or the money raised from other sources. The debt was not to be created by this sale of the crop. It was in existence and the court said: "It could not have been the intention of the parties that if the crop were destroyed, or from any other cause could never be sold, and the defendants could not procure the money from any other source, the debt should never be paid." It should be noted that the debt is absolute and definite, the time of payment being contingent upon the happening of certain events.

One of the leading cases is Pritchard v. McLeod et al., 250 F. 25, 26, 27, 123 C. C. A. 332. There a contract was involved for the sale of certain mining claims for a specified sum, $1,000 of which was paid in cash, $2,500 evidenced by two notes, and the balance from the proceeds of the claims to be derived from subsequent workings. It was held that the defendant could not escape performance by willfully neglecting to work the claims. The court, in discussing the payment of $25,000 out of the gross output of gold taken from the claims, said: "It is elementary that where payment is to be made out of a specific fund, which it is the duty of the obligated party to create, or where the time of payment is dependent upon a condition subject to his control, he cannot escape performance by willfully neglecting to discharge his duty." And says further on page 28: "If we construe the agreement as imposing an obligation upon the defendant to pay the $25,000 only by the application of 25 per cent. of the gross output of the mining claims, then it was his duty to use reasonable diligence to create such a fund." This is perhaps the strongest authority to sustain the position contended for by plaintiff, and yet the case is one where the obligation to pay was not contingent. There was an absolute sale at a stipulated price.

In most of the cases cited by plaintiff on this question, the situation was presented, as we have pointed out, of an obligation to pay a certain, definite, and absolute debt. In many of them the source of payment is contingent, but no contingency exists as to the

creation of the debt. Such are Denny v. Campbell's Ex'r (Ky.) 4 S. W. 301, 9 Ky. Law Rep. 367; Taylor v. Simi Const. Co., 23 Cal. App. 308, 137 P. 1095; Hood v. Hampton Plains Exploration Co., Ltd. (C. C.) 106 F. 408; Gliddon v. McKinstry, 25 Ala. 246; Branch v. Lambert, 103 Or. 423, 205 P. 995; Noland v. Bull, 24 Or. 479, 33 P. 983; Bush v. Merrill et al. (Tex. Civ. App.) 156 S. W. 606; C. C. Slaughter Co. v. Eller et al. (Tex. Civ. App.) 196 S. W. 704; Sears v. Wright, 24 Me. 278; Busby v. Century Gold Min. Co., 27 Utah, 231, 75 P. 725.

Plaintiff contends that the right of reimbursement under the contract is absolute, that only the source of reimbursement is contingent, and that this brings the case within the doctrines of the cited cases, and says (Brief, p. 64): "It is clear enough, however, that under the present contract the right of reimbursement is absolute and only the source is contingent." The contract does speak of the reimbursement as something the second party is entitled to, but qualifies it as being entitled to the same out of the first 50 per cent. of proceeds of the gas sold from the premises after deduction of rentals and royalties. It speaks of "said possible right of reimbursement; 'also' in the event the right to reimburse shall accrue as herein provided."

We cannot agree that the right to reimbursement is an absolute, definite right under the contract. It is clearly a contingent one. The advancement, so designated by plaintiff, but which we consider more in the nature of an amount paid for the right to an option, had nothing to do with gas development. It was a part of the purchase price of the oil rights, if plaintiff decided to take such rights. If it had been the intention of the parties to make absolute the right of reimbursement, it could easily have been so stated in the contract. Indeed, personal liability of defendant is carefully guarded against by this provision: "It is further agreed that in the event the right to reimbursement to the second party of said two hundred fifty thousand dollars ($250,000.00) shall accrue as herein provided, that no liability shall accrue or exist against the first party to make such repayment except out of the production and sale of gas as herein provided, and not otherwise." (Record, p. 28.)

Suppose defendant had met the requirement which the trial court lays down as to development, and had drilled a gas well on each of the twelve parcels of land, or had drilled many wells on each parcel in the hope of developing gas, and had done everything that any one could ask or suggest as to development and yet had secured no gas: it could not, of course, be contended then that any right to reimbursement existed. It must be remembered that defendant did not become a debtor of the Roxana Company when the contract was made. The money was not loaned, as in many of the cases cited. Were the right of reimbursement absolute, the cases cited would be in point; but the right of reimbursement here does not arise under the terms of the contract until there is a fund from the proceeds of gas developed upon the premises. While defendant agreed to duly and properly develop the lands in order that plaintiff be reimbursed, he did not agree to develop or repay the $250,000. He may have breached his contract to develop. The court found upon the evidence which it permitted to be introduced that he had, but that does not create any obligation to repay the entire $250,000 to plaintiff. It certainly does not create a new contract that defendant would be personally obligated in the sum of $250,000 in direct conflict with the provision of the contract that he would not be personally obligated. The purchase price does not furnish the test of the measure of damage under the contract we are considering here, nor is this the case of a contract entirely performed except for the payment of money thereon.

A case quite similar to this is Johnson et al. v. Geddes et al., 49 Utah, 137, 161 P. 910, 914. The contract there was to sell certain unpatented mining claims for $21,000, payable $1,000 on the day of the contract, and various sums on other days to the amount of $12,000; the remaining $9,000 to be paid by the net one-half of the proceeds of ores mined from the property after dividing expense of mining. Defendants made the first four payments amounting to $12,000, and did not thereafter operate the mine or obtain any proceeds from ore up to the time an action to recover the $9,000 was brought by the plaintiff. It should be noted that there was no obligation in the contract to develop the mining claims, and in that respect it differs from this case. The Supreme Court of Utah held that the complaint should be dismissed; that under the contract no payments were due until defendants had obtained at least some net proceeds; that if defendants had obtained net proceeds and had failed to pay plaintiffs' one-half thereof, the plaintiffs could have sued and recovered the said one-half, and no more; and that the burden in such an action would have been

upon them to establish that defendants had realized net proceeds and the amount thereof. The court said: "The defendants can never prevent the plaintiffs from having recourse to the mining claims in case there are net proceeds derived therefrom. Neither can they, under the terms of the contract, have recourse against the defendants personally, nor against the mining claims, unless and until either the defendants, or some one who claims under them, obtain some net proceeds from the mining claims. This is their contract, and they must abide by it." While there was a breach of agreement to develop, the court held that did not create a cause of action for money payable under the contract.

In Hopedale Electric Co. v. Electric Storage Battery Co., 39 App. Div. 451, 57 N. Y. S. 422, 423, 424, there was a contract for sale of plaintiff's electric car plant to defendant for a certain amount to be paid at the time of conveyance, with a stipulation for a competitive test of the parties' systems of storage batteries. $100,000 more was to be paid if plaintiff's system equaled defendant's; $150,000 if it was 5 per cent. better; $300,000 if it was 10 per cent., and $500,000 if it was 20 per cent., better. Defendant after obtaining a conveyance and paying the money, refused to make the tests, and plaintiff sued to recover the $500,000 as money falling due by the terms of the contract. It was held that he could not so recover, but that his right of action was for damages for breach of the contract. The theory of plaintiff's action was that "the defendants having failed to make the test which they were required to make, the amount provided for under said contract in case such test showed that the plaintiff's system was 20 per cent. superior to the defendant's had become due." The court said, "We cannot see how an action for the money agreed to be paid under the contract can be maintained until it is shown that the conditions upon which it was to be paid existed." That, "If the defendants refused to make the test, * * * the plaintiff would have a right to recover damages because of that breach of their undertaking in the contract; and whatever damages they might have sustained by reason of such breach of the undertaking upon the part of the defendants to make this test they would be entitled to recover, not as money falling due by the terms of the contract, but as damages sustained by reason of the defendants' breach of the contract." This case later came before the Supreme Court, Appellate Division, 96 App. Div. 344, 89 N. Y. S. 325, 328.

The plaintiff evidently in the meantime amending its complaint to conform to the previous decision, the claim was for damages on account of breach of the contract. The court said: "The evidence being sufficient, therefore, to establish a breach of the contract, we are called upon to consider what were the rights of the parties under the contract; and this can be easily determined when the rule by which the plaintiff's damage is to be admeasured is arrived at. The plaintiff claims that, the breach having been established, the measure of its damage is the maximum amount secured to be paid by the terms of the contract. In reaching this conclusion it is asserted that such sum was the purchase price of the property dependent upon the test, and, as the defendant was at fault in not making it, such sum became due and payable the moment of the breach. Manifestly such rule cannot obtain. This is not a case where the purchase price furnishes the measure of damages." Further on page 330 the court said: "If it was otherwise damaged by reason of the breach, it must show by proof wherein and how; and if, upon proof, this be established, the sum in which it was damaged may be awarded. There is a presumption of damage arising from the breach of a contract, but such presumption does not go to the extent of measuring the loss. In the absence of proof, it is regarded as nominal." This case was appealed to the Court of Appeals of New York, where the judgment was affirmed. Hopedale Electric Co. v. Electric Storage Battery Co., 184 N. Y. 356, 77 N. E. 394. The court there decided that the purchase price did not furnish the measure of damages.

In Hopedale Electric Co. v. Electric Storage Battery Co., 132 App. Div. 348, 116 N. Y. S. 859, affirmed 198 N. Y. 588, 92 N. E. 1086, the additional payments sued for became due only on condition that the property was shown to have certain excellency; the same being a condition precedent to the right of the seller to claim extra payments. The buyer was at fault, which resulted in denying the benefit of the tests to the plaintiff, but the court held plaintiff could recover only by showing the existence of the conditions entitling him to recover; that the contract did not furnish the measure of damages.

The agreement here on the part of defendant was to develop the lands duly and properly for gas, so that there could be a fund created out of which plaintiff might be reimbursed for the $250,000 which it had paid for the right to secure an option to develop and purchase the oil in and under the

lands. It was not to repay the $250,000 nor did he agree to create a definite fund or pay a definite debt. The contract containing no provision for money payable under its terms by defendant to plaintiff's assignor, an action thereon to recover the $250,000, either as an amount due on the contract or as a part consideration thereof, regardless of the question of damages, cannot be maintained. We see no reason why this contract is any different from any other contract where there is a breach and where the party may be entitled to damages therefor. Plaintiff has its remedy in an action for damages for breach of the contract. The case is not pleaded or tried on the theory of an action for damages. The amended petition does not ask, the evidence does not show, and no effort was made to show, damages. The demurrer filed by defendant to each count of the petition should have been sustained.

In the third count of the amended petition plaintiff avers that by disposing of these gas rights under the leases defendant put it out of his power to fulfill the terms of his contract with plaintiff's assignor to duly and properly develop the lands for gas. If this be the fact, it was a breach of the contract; but we do not see that this in itself would give to plaintiff the right to recover the $250,000 paid by plaintiff under the contract unless the damages for breach thereof should equal that sum. Whether defendant put it out of his power to develop, or refrained from such development, as he had agreed in the contract to do, it would be equally a breach of the contract.

The contract provides for assignment, defendant agreeing, however, not to sell his gas rights in and to the property and premises in bulk without a provision in the assignment and sale thereof for said plaintiff's assignor's possible right to reimbursement of said $250,000 out of the proceeds of such sale. This provision was: "This assignment, however, is made subject to the rights of said Roxana Petroleum Company under and by virtue of said contract of repayment to it of said sum of money out of the sale of gas, as is provided in said contract, it being intended to preserve the rights of said Roxana Petroleum Company to said repayment in accordance with the terms and provisions of said contract, and that said Roxana Petroleum Company shall have all the rights in and to said premises and as against the said assignee herein as it had or could have as against said Robert Watchorn had this assignment not been made; and this assignment is made upon the express condition that said Roxana Petroleum Company as a part of the consideration of this assignment, will carry out and abide by the terms and conditions of said contract."

It appears that the Watchorn Oil & Gas Company drilled one well or part of a well, and endeavored to turn over to the plaintiff a portion of the money it had received from the sale of gas therefrom. Whether this assignment placed it beyond the power of defendant to carry out the terms of the contract, and thus breached it, is a question of fact upon which the court seems to have made no finding or expressed any opinion in rendering judgment.

[6] In view of a probable retrial of this case, we deem it advisable to express our opinion as to the assigned errors with relation to the exclusion of evidence offered by defendant which he claims bears on the question of due and proper development of the lands for gas. Assignments of error Nos. 2, 4, and 12, and 15 to 28, inclusive, relate to this question. It is not essential to set out the various proffers of evidence which the court excluded. Suffice it to say that such evidence relates largely to the futility of further drilling by defendant or his assignee upon the lands covered by the contract.

The excluded evidence, it is claimed, would have shown that gas existed to a limited extent upon the dome of the gas structure which was apparently located in the southwest quarter of section 33, township 23, north, range 3, being on what is known as the Miller tracts, and where a number of wells were drilled by defendant or his assignee, two of which developed gas and the rest oil; that wells were drilled on adjoining lands encircling the red line on Exhibit F, introduced by defendant, to greater depths than on the Miller tracts, without finding any gas bearing sands; that the same failed a short distance from the southwest quarter of section 33, the apex of the geological structure; that such lands by the development made were condemned as gas lands; that the cost of drilling the gas wells on the Miller tracts was more than the value of whole production of such wells, and that the same was soon exhausted; that the rapid dip of the structure, as shown by the drillings along the red line, would indicate very little probability of obtaining gas in paying quantities in the areas immediately surrounding the territory included in this red line, and that, such being the case, there would be no reason to warrant expenditures involved in the drilling of wells on the other tracts covered by the contract; that such evidence also went to the

geological formation of the entire field, to the position of the gas bearing sands, and to the cost of drilling and equipping wells. The red line on Exhibit F, which is to show the location of certain wells and dry holes, passes through section 33 of township 23 north, and section 4 of township 22 north; circles through section 5 of township 22 north, through section 32, back to section 33. Defendant also offered to show that the well known as Fortuna Diamond Miller No. 1, which was on land immediately adjoining land in the contract, and was completed before the contract was made, had a flow at t] at time of 35,000,000 cubic feet of gas, and was shut in as a gas well; that it was the one well in the entire field that disclosed profitable production in the 2,400 and 2,430 foot sands; and that both of said gas sands were short lived.

Defendant offered to show these matters by operators of skill and experience, and to show also by them that the effort made by defendant and his assignee was as much development as prudent, expert, and experienced operators would perform under all the circumstances.

The trial court held all of this proffered evidence inadmissible on the theory, as stated by it, that the contract required development of all of the land for gas, and that development meant to drill a well on each of the tracts of land included in the contract, regardless of any facts that might be shown bearing on the question of absence of gas in these lands. While the statements of the learned court are not subject, of course, to review, we refer to them merely as showing the court's reason for excluding some, if not all, of the proffered testimony. This was the view likewise of counsel for plaintiff as expressed very clearly in their brief.

The question is therefore presented whether the phrase in the contract, "to duly and properly develop said lands for gas," means that it was the duty of defendant to drill a gas well on each of the parcels of land embraced therein. Many expressions, such as "paying quantity," and "proven territory," have, by custom and usage, a fixed meaning in the oil territory and oil business. The same fixed meaning does not seem to have been so established as to the expression "due and proper development," although the term has often been dealt with by the courts in controversies arising out of oil leases. To sustain the exclusion of this evidence and to support the theory adopted by the court, plaintiff cites a number of cases, to some of which we refer, viz.:

In Johnstown & F. R. Co. v. Egbert et al., 152 Pa. 53, 25 A. 151, 152, there was a distinct agreement in the lease that the lessee should drill wells on the land, and the court held that under such agreement the test of surrounding property was not the test required by the lease, saying: "It does not follow that, because there was no oil on adjoining property, oil might not have been struck on this large tract."

In Gibson v. Oliver, 158 Pa. 277, 27 A. 961, the oil lease provided for putting down two wells.

In Cochran v. Pew et al., 159 Pa. 184, 28 A. 219, 220, the lease provided for the sinking of a test well. It is interesting to note in this opinion that the court refers to the view urged, it is said, with force, by distinguished counsel: "That it must now be accepted as a demonstration of science that putting down a well on land shown by exploration of neighboring territory to be dry is a useless expense and damage, and that parties, in contracting on the subject, must be considered to have had this fact in mind, would be a strong argument to the jury, if the case was one for them, that the plaintiff had suffered no actual damages by the defendants' default"—indicating that the court's conclusion was arrived at because of the specific stipulation in the lease that a well should be created on the land.

Eysenback v. Cardinal Petroleum Co. (Okl. Sup.) 236 P. 10, is an action likewise where defendant bound himself to drill, the court holding that he could not defend a breach of such promise by showing the drilling of other wells adjacent to the property as proof of the fact that production would not be found upon the property by drilling the wells. Thornton on Oil and Gas, § 123, states the same doctrine.

In Springer v. Citizens' Natural Gas Co., 145 Pa. 430, 22 A. 986, there was an express agreement to complete a well.

Minchew et al. v. Morris et al. (Tex. Civ. App.) 241 S. W. 215, 217, does not throw any particular light on the question at issue here, nor does Consolidated Mut. Oil Co. v. United States, 245 F. 521, 157 C. C. A. 633. Minchew v. Morris construes the term "proven territory," and interestingly says: "Of course, no particular area can be known to contain oil until the wells are actually drilled and the oil is thus discovered. Such are the uncertainty, irregularity, and elusiveness which characterize the deposit of oil lying beneath the surface in the average oil field that barren areas are not infrequently found to exist in what is regarded as proven terri-

tory. All these facts with reference to the pursuit of speculating in oil lands and producing oil are matters of judicial knowledge because of the universality with which they are known and acted upon in this state."

Practically all of the cases cited by plaintiff on this subject are where there was a distinct agreement to drill wells. Of course, if the contention of plaintiff is correct that the obligation to duly and properly develop was an obligation to drill on each and every parcel of land covered by the contract, then the cases are in point. Otherwise the cases are clearly distinguishable. We are not satisfied that the term as used in this contract means what plaintiff contends and what the trial court decided. The circumstances surrounding the transaction and the situation of the parties are properly to be considered, not to change the contract, but to throw light on the intention of the parties as to the meaning of the term "duly and properly develop," as used therein.

This court said in Kauffman v. Raeder et al., 108 F. 171, 175, 47 C. C. A. 278, 282, 54 L. R. A. 247: "That the situation of the parties when the contract was made, its subject-matter, and the purpose of its execution, are material to determine the intention of the parties and the meaning of the terms they used, and that when these are ascertained they must prevail over the dry words of the stipulations." See, also, In re Morgantown Tin Plate Co. (D. C.) 184 F. 109.

Plaintiff or its assignor had received in substantial part at least for the consideration of $250,000 the right to explore this tract of 1,600 acres, to sink wells, and to secure an option on the crude petroleum therein by an additional payment of $750,000. The $250,000 paid was not for gas development, but for tentative oil rights. Plaintiff's or its assignor's interest in development was limited to the production of a fund, out of which it would receive $250,000. Their interest in the development would then be ended, and they would be uninterested in whether defendant further developed the land or not. It is difficult to imagine that either party had in mind the result now insisted upon, viz., that the term meant to drill on each and every parcel of land, regardless of expense, and regardless of evidence showing absence of gas bearing sands on a portion of the premises. Certainly defendant did not intend to bind himself, as a skillful operator, to expend sums possibly many times in excess of the reimbursement plaintiff's assignor

might claim if the result therefrom were certain or reasonably probable to be barren of producing gas. The proffered evidence shows the expense of the two wells drilled was $76,000. If the other ten wells, insisted as necessary to be drilled to duly and properly develop, had cost at the same ratio, defendant or his assignee would have been compelled to expend approximately $380,000 more in order to possibly reimburse plaintiff's assignor for the $250,000 expended in its speculative venture, even though defendant might be able to show by skilled and experienced operators that there was no possibility of securing gas outside of the lands drilled.

These twelve parcels of land, while not all contiguous, were located in the same field known as the Morrison or Otoe field. The meaning and intention of the contract, as we view it, in relation to the development either for oil or gas, was to treat all the lands included therein, not as separate parcels, but as one tract—an entity. If the development on one of the parcels of land was sufficient to produce the fund out of which plaintiff or its assignor could be reimbursed, that development would have answered the requirements of the contract. Plaintiff suggests that if the contract related to one parcel of land only, it could not well be claimed that defendant need not drill thereon, or that he could excuse development by showing expense and futility thereof. Due and proper development of even one tract might require the drilling of more than one well, just as due and proper development of the entire premises or lands considered as an entity might require the drilling of many wells. Could it be claimed if the contract covered only one parcel of land that, after a well had been drilled thereon and it could be shown by evidence of skilled and experienced operators or by the geological structure or other evidence that there was no reasonable probability of gas in the sand strata passing through the tract, or that the supply had ended, defendant was compelled to go ahead and drill more wells. If so, how many? We do not understand why a hard and fast rule of one well to each parcel of land should be adopted. What particular divinity surrounds drilling that establishes it as the supreme and only test of gas, and if one well, why not two or three or more wells? Of course, if the agreement was to drill wells on every tract, the question would be different. If such were the intention, it could easily have been stated in the contract. Throughout the contract one finds

no reference to development of "each parcel of land." Such terms are used as,

"above-described premises,"
"operation of the premises,"
"from the premises,"
"any part of the premises,"
"on the premises,"
"the oil underlying the lands,"
"the oil bearing sands."

These expressions throw light on the intention of the parties. We are satisfied that the due and proper development provided in the contract was intended to relate to the development of the entire premises covered by the contract considered as an entity.

Many cases have established the doctrine as to leases covering different tracts, some contiguous and some not, that the lease covered the entire tract as an entity, and that the drilling of a well upon a noncontiguous tract thereof was sufficient to extend the life of the lease on the entire tract. See Gypsy Oil Co. v. Cover et al., 78 Okl. 158, 189 P. 540, 11 A. L. R. 129; South Penn Oil Co. v. Snodgrass, 71 W. Va. 438, 76 S. E. 961, 43 L. R. A. (N. S.) 848; Wilson v. Purnell et al., 199 Ky. 218, 250 S. W. 850; Harness et ux. v. Eastern Oil Co. et al., 49 W. Va. 232, 38 S. E. 662; Cadillac Oil & Gas Co. v. Harrison et al., 196 Ky. 290, 244 S. W. 669; Thornton on Oil and Gas, § 920.

The terms "proper development" and "development" have been considered by the courts in connection principally with leases of oil and gas rights. While there are differences, of course, between leases and a contract such as here involved, we see no reason why the words should have any different meaning in a contract from that which they might have in an ordinary lease. For the reasons hereinbefore pointed out, that plaintiff's interest in the development was limited, the terms in dispute would not, we think, have any broader meaning in this contract than in ordinary leases where the lessor would be interested in the full development of every part of the land included in the lease and entitled to his part of the proceeds of the entire development. Defendant was to have a part of the net profits from the development for gas; hence the situation bears some similarity to that of lessor and lessee. Whether the rule as to construction of the term "due and proper development" is any different in leases from what it is in a contract of this character, the decisions as to the meaning of the term or similar terms in leases are helpful in arriving at the construction that should be given to the words as used in this contract. In a number of the cases referred to, the obligation under the lease to develop is an implied one, but that can make no difference in the construction of the term. We refer to some of these cases.

In Brewster v. Lanyon Zinc Co., 140 F. 801, 814, 72 C. C. A. 213 (this court), the question arose as to the measure of diligence which lessee was required to exercise in prosecuting a work of exploration and development during the first five years of the contract. The lease required a drilling of one well during the first five years, but did not define the measure of diligence to be exercised in the work of development after the expiration of the five years. The court held there was a covenant by implication that if during the five years for exploration and development of oil and gas, one or both were found in paying quantities, the work of development and production should be continued with reasonable diligence, and the court discussed the question of what would be reasonable diligence, saying:

"But, while this is so, no breach can occur save where the absence of such diligence is both certain and substantial in view of the actual circumstances at the time, as distinguished from mere expectations on the part of the lessor and conjecture on the part of mining enthusiasts. The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests, as well as those of the lessor. No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required. Whether or not in any particular instance such diligence is exercised depends upon a variety of circumstances, such as the quantity of oil and gas capable of being produced from the premises, as indicated by prior exploration and development, the local market or demand therefore or the means of transporting them to market, the extent and results of the operations, if any, on adjacent lands, the character of the natural reservoir —whether such as to permit the drainage of a large area by each well—and the usages of the business. Whatever, in the circumstances would be reasonably expected of operators of ordinary prudence, having regard to

the interests of both lessor and lessee, is what is required."

In Harris v. Ohio Oil Co., 57 Ohio St. 118, 127, 48 N. E. 502, 505, the court said:

"The development and protection of lines which is thus implied when the lease is silent is such as is usually found in the same business of an ordinarily prudent man—neither the highest nor lowest, but about medium or average. We therefore hold, both on principle and authority, that there is an implied covenant in this lease to reasonably develop the lands, by drilling and operating such number of wells as would be ordinarily required for the production of the oil contained in such lands, and afford ordinary protection to the lines."

In Goodwin v. Standard Oil Co. v. Louisiana et al. (C. C. A.) 290 F. 92, the question was involved of reasonable diligence in drilling wells. This action was to cancel an oil and gas lease in which there was an agreement on the part of lessee to drill a test well on the premises or within six miles of the same within one year. The question arose as to whether there had been reasonable diligence, and the court held that the tests set forth in Brewster v. Lanyon Zinc Co., supra, were applicable to the case under consideration, involving an alleged implied covenant to drill protection wells, and quoted with approval from the Brewster Case that, "Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required."

In Foster et al. v. Elk Fort Oil & Gas Co. et al., 90 F. 178, 182, 32 C. C. A. 560, the action was to enjoin interference with operation of the complainants under certain oil leases. We quote from the opinion as follows: "It is earnestly contended that the lessee was not obliged to bore a well on every parcel included in the four districts. We do not say that he was obliged to do this. Perhaps, when he found by his experiment, that he had gone over 2,000 feet, and found nothing, he was under no obligation to continue his explorations."

In Grass et al. v. Big Creek Development Co., 75 W. Va. 719, 84 S. E. 750, L. R. A. 1915E, 1057, where an oil and gas lease was involved for breach of which damages had been recovered, the question of reasonable diligence in prosecuting operations upon the part of lessee was involved. There the court said with reference to the consideration of surrounding circumstances:

"Among such circumstances and conditions are the situation of the parties; the character of the mineral products; the nature of the oil-bearing sand, whether dense or soft and porous; developments on contiguous lands, whether by same or different operators; cost of drilling; proximity to market, and facilities for marketing; current prices, whether high or low; location of the lands; and such other conditions attendant upon the operations as may explain necessity for prompt, or excuse for delayed, action in prosecuting such developments. And if, considering these, the operator has exercised that reasonable diligence and sound, practical judgment common to and exercised by operators of ordinary prudence and experience in the same business under the same or similar circumstances and conditions, plaintiff cannot recover."

And also on page 754, 84 S. E., 75 W. Va. 729:

"Or, differently stated, has the operator exercised that degree of diligence reasonably and ordinarily exercised by prudent operators engaged in the same line of business under the same or similar circumstances and conditions, keeping in view the covenants of the lease and the mutual benefit and advantage of the parties to the contract? If he has been thus diligent, plaintiffs cannot recover; otherwise, they can recover for the loss sustained by them as the result of the unreasonable delay in the drilling of wells and the production of oil on their lands."

Pelham Petroleum Co. v. North, 78 Okl. 39, 43, 188 P. 1069, 1072, was an action brought to declare forfeiture of a certain oil and gas lease. Agreement had been made in the lease to commence a well within 30 days, and one well was to be completed each year until three wells had been completed. There was involved in the case the question of whether defendant had developed certain of the property in the manner contemplated by the lease. The court considered the law applicable to cases where it is sought to forfeit an oil and gas lease for failure of lessee to exercise reasonable diligence in prosecuting the work of production and development, and said:

"Now in the instant case several operators of experience testified that the defendant company had diligently and properly developed the leased premises. It is true that this is expert evidence, but it is in harmony with all the other evidence in the record, and it seems to us is the only logical deduction that can reasonably be drawn therefrom, and we are satisfied, after a consideration of the facts above related, together with all the

other evidence in the record, that the lessee has done all that could reasonably be expected of it, unless it should have drilled an offset well on the northwest 40 in controversy, to which inquiry we now pass."

In Peerless Carbon Black Co. v. Gillespie et al., 87 W. Va. 441, 105 S. E. 517, 525, the obligation of lessee was to produce and furnish gas in certain quantities in designated territory. There was no provision as to the degree of diligence in developing the territory. The court held there was complete performance of the covenant as construed by the said sublessee "in the light of the situation of the subject-matter and parties, the conditions surrounding them and recognized methods of mining." The court recognizes the effect of surrounding conditions and the nature of the enterprise itself, as vital elements controlling in their effects.

In Jennings v. Southern Carbon Co. et al., 73 W. Va. 215, 80 S. E. 368, 370, a failure to properly test plaintiff's land for oil and gas under a lease for that purpose was claimed. The court referred to Brewster v. Lanyon Zinc Co., supra, on the subject of what constitutes a breach of the implied agreement to develop. Speaking of the contract, and of the judgment of one experienced in developments under leases of such character, and as to it being controlling when compared with that of the landlord, the court said: "To serve him, it must conform to that judgment generally exercised by other operators under similar circumstances and conditions and in view of the real purpose and intention of the parties when entering into the agreement."

In Howerton et al. v. Kansas Natural Gas Co., 82 Kan. 367, 369, 108 P. 813, 814, 34 L. R. A. (N. S.) 46, being opinion on rehearing, the court said:

"The default consisted in the failure to properly develop the leased territory by drilling and operating a reasonable number of wells necessary for that purpose, and the failure to market gas and make the payments, stipulated for the well completed. No reason is shown why witnesses of experience, acquainted with the gas field, may not testify with reasonable accuracy as to the number of wells which should have been drilled on the leased land both for protection from drainage by neighboring leaseholds and to obtain the gas underneath the land. No insurmountable obstacle to such proof is perceived by the court, and, in the absence of evidence that it cannot be produced, it is concluded that the plaintiff is not entitled to a remedy by forfeiture or cancellation of the lease."

In Masterson v. Amarillo Oil Co. et al. (Tex. Civ. App.) 253 S. W. 908, 915, action was to cancel an oil and gas lease. Two wells had been sunk near the leased premises resulting in dry holes. The court said:

"It is further shown that about $350,000 has been spent by Nobles and his associates and the corporation since its organization, and its assignees, in the development of the field, the greater part of this sum having been expended prior to the time Masterson served his notice of forfeiture; that a part of such sum was used in an effort to secure two different oil wells by deep tests near the lease in question, which resulted in dry holes. We think these facts sustain the court's finding that the appellees have used reasonable diligence in development and in their efforts to secure a market for the gas since it was discovered, and the further finding that gas has been discovered in paying quantities, resulting in the vesting of title. * * * After discovering gas in paying quantities the further obligation to drill for oil upon the leased premises, under all the circumstances, and in the light of the subsequent agreement, depends upon the question whether, in the use of reasonable diligence, they should have prospected for oil in another place or by a deeper test. After having found two dry holes near the land in question, whether the appellees should have prospected further is an issue of fact, which the trial court has decided against appellant. We would not be warranted in holding as a matter of law that such duty rested upon appellees."

In Prince et al. v. Standard Oil Co. of Louisiana, 147 La. 281, 84 So. 657, 659, the question is discussed of the extent of diligence required of lessee to prosecute the work of production. The court holds it is dependent on what would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessee and lessor. The court said:

"The defendant cannot deal with the leased premises of plaintiffs so as to serve its own peculiar and selfish interests exclusively, unmindful of its obligation to the source from which its authority is derived. Its duty was to promote the mutual advantage and profit of the lessor; and, to excuse the operator, its judgment 'must conform to that judgment generally exercised by other operators under similar circumstances and conditions, and in view of the real purpose and

intention of the parties when entering into the agreement.' "

See, also, Indiana Oil, Gas & Development Co. v. McCrory·et al., 42 Okl. 136, 140 P. 610.

We are of the opinion that the general principles laid down by this court in Brewster v. Lanyon Zinc Co., 140·F. 801, applicable to reasonable diligence in developing, are applicable here in determining the question of what the term "to duly and properly develop said lands for gas" as used in the contract, means. That case was followed in part by this court in Hamilton v. Empire Gas & Fuel Co. (C. C. A.) 297 F. 422.

We believe the correct rule to be applied to this contract is that "duly and properly develop said lands for. gas," as the term is used therein, relates to the development of the entire tract considered as an entity, and not to each separate parcel of land, and further that the term as therein used means such reasonable development, taking into consideration the relationship of the parties to each other, and all the circumstances surrounding and involved in the entire transaction covered by the contract, as would be expected of prudent, skillful, and experienced operators.

It cannot be said as a matter of law that, under the terms of this contract, there is not due and proper development for gas unless a well is drilled on each parcel of land included therein. What is due and proper development of the entire tract is a question of fact.

It is apparent that under the rule we have laid down much of the evidence tendered was admissible, and the court erred in its exclusion. Other assigned errors become immaterial in view of our conclusions.

Upon the facts presented by this record, the judgment as entered was erroneous. The same is therefore reversed, and the case is remanded for further proceedings in harmony with the views expressed in this opinion.

Reversed. ⁄