### COSDEN et al. v. CLINE et al.

### CLINE et al. v. COSDEN et al.

Circuit Court of Appeals, Eighth Circuit.
May 7, 1928.

Nos. 7921, 7922.

1. **Contracts** ⬤⟹23—Attempted acceptance of offer, on new conditions, may be treated as rejection.

An attempted acceptance of an offer, coupled with new conditions, may be treated as a rejection, and relieves further performance.

2. **Mines and minerals** ⬤⟹77—Assignees held entitled to treat assignors' acceptance of their offer to reassign oil lease, on condition that personalty be left thereon, as rejection.

Letter from assignees of oil and gas lease, reciting intention to surrender lease and requesting instructions as to reassignment, and further advising assignors of willingness to sell personal property on lease, including casing in wells, *held* unconditional offer to reassign, and assignors' reply that they would consent to reassignment on condition that personalty then on lease be left thereon, so that they could operate wells if they desired, could be treated by assignees as a rejection, and authorized them to offer lease to original lessor.

3. **Mines and minerals** ⬤⟹77—Personalty placed on assigned oil lease on reassignment thereof did not go with lease.

Under the law of Texas, making casing in oil well personal property and lease for oil well real estate, personal property placed on lease after it was subleased did not go with lease on reassignment.

4. **Mines and minerals** ⬤⟹78(1)—Assignees of oil lease held not obligated to drill any fixed number of wells, but only to prosecute development with reasonable diligence.

Where oil and gas lease provided that lessee should fully develop entire tract as expeditiously and diligently as practicable, and assignment thereof for specified sum provided for drilling of offset well, and diligent, continuous, and good-faith prosecution of development, and that in addition assignees would pay $132,000 out of sales of oil and gas produced, *held*, that assignees were only required to proceed with development and production with reasonable diligence, in order that property might be developed to mutual advantage and profit to all parties interested, and were not obligated to drill any fixed number of wells, and, having properly offered to reassign to assignor because further development was not warranted, they were not liable for any part of the additional $132,000.

In Error to the District Court of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

Action by Joseph W. Cline and others against J. S. Cosden and others. To review the judgment, both parties bring error. Reversed in part, and in part affirmed.

W. I. Williams, of Tulsa, Okl. (Nathan Newby, of Los Angeles, Cal., and Davidson & Williams, of Tulsa, Okl., on the brief), for plaintiffs.

R. H. Wills, of Tulsa, Okl. (J. C. Denton, J. H. Crocker, I. L. Lockewitz, and H. M. Gray, all of Tulsa, Okl., on the brief), for defendants.

Before KENYON, Circuit Judge, and SCOTT and SYMES, District Judges.

SYMES, District Judge. A proper understanding of our views requires a rather detailed statement of the facts:

Joseph W. Cline, Henry V. Wall, and S. R. Deacon brought an action at law in the United States District Court for the Eastern District of Oklahoma against J. S. Cosden, J. S. Cosden, trustee for Cosden Oil & Gas Company, and the Cosden Oil & Gas Company, to recover the sum of $195,674.20, with interest at 6 per cent. per annum from July, 1921, as damages for the alleged breach of a written contract, dated July 3, 1918, between Cline, Wall, and Deacon, as parties of the first part, and J. S. Cosden, trustee for Cosden Oil & Gas Company, as party of the second part, providing for the assignment and development of an oil and gas lease on 560 acres of land in Coleman county, Texas, known as M. Izod survey No. 172, excepting 80 acres in the form of a square out of the northwest corner of said survey.

A jury was waived by agreement of the parties and the case tried to the court, resulting in judgment in favor of the plaintiffs and against the defendants in the sum of $40,000, together with interest from July, 1921, at the rate of 6 per cent. per annum, which sum the

court found represented the value of the 560-acre lease, including the two wells thereon, and the machinery and equipment attached and incidental thereto as of July 11, 1921. Both parties to the litigation have sued out writs of error to review this judgment.

The facts are that on the 14th day of May, 1917, G. M. Gray and Mary M. Gray, of Coleman county, Texas, executed and delivered to Joseph Cline and Henry V. Wall, of Los Angeles county, California, an oil and gas mining lease covering eight tracts of land in Coleman county, Texas. One of these tracts, tract No. 7, known as Izod survey No. 172, contained a net acreage of 560 acres. On November 15, 1917, Cline and Wall assigned to S. R. Deacon an interest in said lease in so far as it affected said tract No. 7 above described. This lease provided, among other things, as follows (italics ours):

"If at any time during operations under this lease, oil or gas shall be discovered in paying quantities in any well drilled on the leased premises herein granted, then in that event the lessees herein, their heirs or assigns, shall not close up nor cap said well longer than reasonably necessary to handle the product thereof, but shall operate the same taking therefrom the oil or gas so found so long as the same shall produce oil or gas in paying quantities and shall market the same, if the market justifies, and the ·one-eighth royalty of the lessor shall be marketed, together with the other part of the products of said well, if lessor so elects, provided, in event of market being too low to justify production or sales, prospecting operations and production may be suspended not longer than 180 days.

"Should the lessees, their heirs, or assigns, *at any time desire to abandon any well* drilled on the leased premises, then in that event, before same shall be abandoned or closed up, the lessor shall have the right to have said well examined, either by himself or by any person or persons he may designate, paying all expenses therefor, and if upon examination of said well the lessor should decide to operate, and lessees shall not desire to operate same, then in that event, the lessees shall at once turn same over to the lessor by properly written transfers and at the expense of the lessees, their heirs and assigns, upon lessor paying for the necessary pipe that it is necessary to keep in said well on a basis of prices for second-hand oil pipe of like dimensions then prevailing.

"In the event oil or gas shall be discovered in paying quantities on any one of the tracts of land hereinbefore described, then the lessee shall fully develop said entire tract of land for the production of oil as expeditiously and diligently as practicable, and in the event of failure to develop expeditiously and diligently as practicable, the lease on that particular tract shall be henceforth null and void, except for ten acres in the form of a square around said producing well as a center.

"The first well drilled on said tract of land shall be drilled to a depth of not less than 3,500 feet, unless oil or gas be discovered in paying quantities at a shallower depth in said well, or unless Mississippi lime or other undrillable strata be encountered."

On July 3, 1918, this lease then being undeveloped, Cline, Wall, and Deacon assigned it to J. S. Cosden, as trustee for the Cosden Oil & Gas Company, by virtue of a written contract to assign, and a formal assignment, both instruments bearing date July 3, 1918. Under and by virtue of this written assignment, the defendant the Cosden Oil & Gas Company paid to the plaintiffs $132,000. The assignment of the lease provided that for said assignment the assignee, in addition to the $132,000 money paid, should pay the sum of $132,000, to be paid monthly "out of the sales of the seven-eighths working interest of both oil and gas produced from the land covered by or described in said assignment at the rate of 30 per cent. of said seven-eighths working interest," and further provided that, in case any well drilled during the term of the lease should produce 500 barrels or more of oil per day, a further consideration of $68,000 in cash should be paid out of said seven-eighths working interest of both oil and gas produced from the land covered by said assignment, at the rate of 30 per cent. of said working interest. The assignment further provided:

"Second party further agrees to offset what is known as the Mitchell well No. 1 immediately, and in any event within sixty (60) days from the date of the execution of this instrument, and said second party further agrees to drill all offset wells promptly and diligently and to start same within not to exceed thirty (30) days from the date of completion of any line wells on adjoining property and in any event said second party agrees to comply with the laws of the state of Texas as to offset wells.

"It is further understood and agreed by and between the parties hereto that as soon as said second party shall start development on the herein described property by the commencement of the drilling of the offset well to the Mitchell well No. 1, that he shall there-

after diligently, continuously and in good faith prosecute the development on the herein described property, strikes, damage by the elements, acts of God, war, and delays not under the control of said second party excepted."

After the execution of the contract of assignment and the assignment, the Cosden Oil & Gas Company entered into possession of the leased premises and drilled two oil wells thereon. The first well was drilled to a depth of approximately 2,480 feet and the second well to approximately 2,476 feet. Well No. 1 came in with a production of about 30 or 35 barrels per day, and well No. 2 of about the same amount. Both wells rapidly lost in production, and at the time of the trial were producing between 10 and 12 barrels a day for the two wells while being pumped. It cost approximately $34,000 to drill the first well, and $32,000 to drill the second well, and the defendants purchased $32,270 worth of equipment to operate the lease, and had an operating cost of $32,377.08 up to the time the lease was abandoned. $4,325 was paid to plaintiffs as royalties from oil produced from these two wells. Other wells were drilled by other oil companies around this lease and turned out to be either dry holes or wells that did not pay. On July 12, 1920, the Cosden Oil & Gas Company, through its vice president, addressed a letter to Wall, Cline, and Deacon, which contained, among other things, the following:

"This is to advise you that the experience of this company with the two wells drilled and now being operated upon said property, and our observation as to the other wells drilled surrounding this property for a radius of a number of miles, and a general survey of the whole situation by our most experienced men have convinced us that there is no oil under this property which can be produced at a profit, and that there is absolutely nothing to justify us in spending any more money in an effort to develop this property or in any effort to produce oil and gas therefrom, and our experience and business judgment have convinced us that there is only one logical thing for us to do, and that is, to surrender the property. We have, therefore, determined to abandon the property, and as provided in the assignment from Cline, Wall, and Deacon to J. S. Cosden, we are obliged to make a reassignment of the property to you if you so desired. We therefore request that you instruct us as to whom the assignment shall be made, and upon this advice we shall prepare and forward to you a proper assignment.

26 F.(2d)—40½

"We further wish to advise you that we have several thousand dollars' worth of personal property upon this lease. If you desire to continue to operate the wells that are now being operated, or drill other wells, and desire to purchase all, or any part, of this property, at its reasonable value, we shall be glad to sell it to you. We wish to mention especially the casing in the wells, as, if the casing is drawn, of course, the wells would be useless, and if you desire to continue their operation you will probably want the casing left in the wells.

"We will thank you for a prompt reply to this letter, for the reason that, if you do not desire to have the property reassigned to you, we want to release it to the original lessors. Kindly address your reply to the undersigned at the Tulsa office."

The plaintiffs replied through their attorneys on July 20th, in which they stated (italics ours):

"They are willing to *consent to a reassignment* of the property to them *upon condition* that you leave on the leased premises the personal property upon the lease, so that they may operate the wells that are now being operated, or drill other wells, if they so desire.

"We are of the opinion that a fair interpretation of the contract existing between you and Messrs. Wall, Cline and Deacon would require the leaving of this property upon the leased premises as requested by them, and upon which they insist. If you do not agree to this interpretation, and are not willing to reassign the lease to them and leave on the leased premises the personal property now located thereon, we request that the provision for an arbitration of the differences existing be enforced. If you are not willing to assent to this proposition, we request that you select an arbitrator, my clients will select one, and the two members so selected will elect a third, and decide the difference existing between the parties to the contract, and whether or not anything should be paid, and, if so, how much, for the retention of the personal property."

The parties could not agree upon what was to be done, and in July, 1921, the Cosden Oil & Gas Company reassigned the lease, and conveyed the wells, rigs, derricks, etc., to W. A. Gray, who the defendants supposed was acting for the lessors. The plaintiffs then began this action. At the conclusion of the trial the court made a memorandum of his findings denying the plaintiffs the right to recover $132,000 as a liquidated sum for abandonment of the contract, but did find that the defendants should have reassigned

the 560-acre tract, with the wells on it and all machinery necessary to operate the wells, to the plaintiff, and for failing so to do the defendants were liable in damages to the plaintiffs in the sum of $34,000.

Thereafter plaintiffs prayed leave to amend the complaint, and to reopen the case to introduce further evidence as to the value of the leased premises at the time of the abandonment, and on April 9, 1926, submission of the case was set aside, and the plaintiffs permitted to amend their original complaint as follows:

"That the reasonable value of the said property described in said contract herein set forth at the time the same was abandoned by the said defendants was and is the sum of $150,000, and that by reason of the abandonment of said property and the assignment of the demised premises to the said Greer W. Gray, the said plaintiffs have been damaged in the sum of $150,000, no part of which has been paid."

Evidence was then received as to the value of the lease, and on November 21, 1925, the court made findings of fact and conclusions of law. In these findings of fact the court, among other things, said:

"I find that in making this assignment to the Grays, defendants abandoned this contract. Under the principles announced in Watchorn v. Roxanna Petroleum Corporation (C. C. A.) 5 F.(2d) 636, I conclude that plaintiffs are not entitled to recover the liquidated sum of $132,000, but are entitled to damages for breach of the contract. This is not the abandoning of a well as provided for in the second paragraph of the original contract, which was for the benefit of the lessor, but this is the abandoning of the development of the 560 acres after it is proved not to be profitable for the assignees to develop and operate under said lease. When defendants determined to abandon the contract, it was their duty to turn back by reassignment to their assignors the 560-acre lease, with the wells on it and with all the machinery attached to and incident to or necessary to operate the wells, just as the plaintiffs demanded, and that was the construction then put on the assignment or contract by plaintiff's attorney. By reassigning to the original lessor, defendants further damaged plaintiffs to the value of the lease including the wells and the equipment attached to the wells. On the original hearing no evidence was attempted to be introduced as to the value of the lease. On the hearing, which was had after the amendment to the complaint or petition, evidence was introduced, not only as to the value

of the lease, but also as to the material attached to the wells. I originally found that the two wells which were drilled or developed at a loss still had some value as an operating proposition. I find that the 560-acre lease, including the two wells thereon, and the machinery and equipment attached and incidental thereto, at the time said lease was assigned over to the Grays, was of the value of $40,000, and that plaintiffs are entitled to recover of and from the defendants the sum of $40,000, with interest from the date of the breach, prior to the time this action was originally instituted, which was July 11, 1921, at the rate of 6 per cent. per annum."

To these findings Cosden et al., plaintiffs in error in No. 7921, excepted, because judgment for $40,000 and interest was entered against them. The plaintiffs in error in No. 7922, Joseph W. Cline et al., complain because the court did not enter judgment for a larger sum. For convenience, the parties are referred to herein as designated in the court below.

The briefs are exhaustive and discuss a number of questions. As we view the record, however, a decision of the two questions we will discuss is all that is necessary to a proper disposition of the case.

[1, 2] First. Were the defendants excused from performance of their covenant to reassign the lease to the plaintiffs by the conduct of the latter as evidenced by their letter of July 20th? The offer of defendants to reassign was in strict conformity with the terms of the assignment and free from conditions. Counsel for plaintiffs argue that it was made conditional upon the plaintiffs paying for all the material and equipment then on the lease. We do not so read the letter. The offer to sell the personal property that defendants had brought upon the lease was separate and apart from the offer to reassign, and was treated as a separate matter, and in no way limited the unconditional offer to reassign pursuant to the terms of the lease and assignment. It likewise put the plaintiffs on notice that, if they did not avail themselves of the offer, the defendants intended to release to the original lessors as required. Plaintiffs replied to this under date of July 20, 1920, stating that they would "consent to a reassignment" upon condition that the personal property then on the lease be left thereon, so that the plaintiffs could operate the wells, if they desired. It is not contended that this constituted an acceptance of defendants' offer. It is elementary that an attempted acceptance of an offer, coupled with new conditions, may be treated as a rejec-

tion, and relieves further performance. This being so, the defendants had the right to thereafter offer the lease back to the original lessor. This letter makes it apparent that the plaintiffs were attempting to get something that they were not entitled to under the contract.

We cannot agree with the finding of the lower court that: "When defendants determined to abandon the contract, it was their duty to turn back by reassignment to the assignors the 560-acre lease, with the wells on it, and with all the machinery attached to and incident to or necessary to operate the wells, just as the plaintiff demanded, and that was the construction then put on the assignment of contract by the plaintiffs' attorney."

[3] This is a Texas contract, governed by the laws of Texas, and it has been held in that state, with relation to casing in an oil well, that it is personal property, and that a lease for an oil well is real estate. So the personal property, not having been on the premises when subleased, but put there by the defendant, did not go with the lease. Under the original contract between the Grays and Cline and Wall, it was provided that, on the termination of the lease, a proper instrument of release to the lessor should be executed, and it was also provided—which is rather unusual in leases of this character—that, if the lessor desired to keep the equipment in case of abandonment, he should pay for the same.

[4] The second proposition, and the most important, perhaps, is: Did the defendants breach the contract by ceasing operations? The obligation assumed under the original lease was, "Lessee shall fully develop said entire tract of land for the production of oil as expeditiously and diligently as practicable," and in the contract sued on between the immediate parties it was agreed:

"It is further understood and agreed by and between the parties hereto that, as soon as said second party shall start development on the herein described property by the commencement of the drilling of the offset well to the Mitchell well No. 1, he shall thereafter diligently, continuously, and in good faith prosecute the development on the herein described property, strikes, damage by the elements, acts of God, war, and delays not under the control of said second party excepted."

It is conceded that the defendants drilled an offset well to the Mitchell well. They operated the two wells on the premises for 32 months, one well operating for 4 months, with an operating cost that exceeded production by $22,283, and at the time of the trial the wells were not paying from an operator's standpoint. The estimated cost of drilling an additional well was $35,000. Defendants' promise to pay the additional $132,000 was conditioned upon the production of oil in sufficient quantities to pay this sum. They could not pay it out of oil, if the oil was not produced, or not in the ground.

These covenants did not impose an obligation to drill any fixed number of wells, and, having admittedly discovered oil or gas in paying quantities, defendants were only required to proceed with the work of development and production with reasonable diligence, in order that the property involved might be developed to the mutual advantage and profit of all parties interested.

The Roxana Case, 5 F.(2d) 636, holds that it would be unjust to require an operator to drill wells if no favorable result could be obtained. This court in that case said, at page 646: "Certainly defendant did not intend to bind himself, as a skillful operator, to expend sums possibly many times in excess of the reimbursement plaintiff's assignor might claim, if the result therefrom were certain or reasonably probable to be barren of producing gas."

At page 650 the court said: "We believe the correct rule to be applied to this contract is that 'duly and properly develop said lands for gas,' as the term is used therein, relates to the development of the entire tract considered as an entity, and not to each separate parcel of land, and further that the term as therein used means such reasonable development, taking into consideration the relationship of the parties to each other, and all the circumstances surrounding and involved in the entire transaction covered by the contract, as would be expected of prudent, skillful, and experienced operators."

The evidence establishes that the development of this oil field did not meet the expectations entertained by the parties when the contract was entered into. The two wells drilled gave out. There were no other producing wells in the adjoining territory, and all this, together with other facts, was sufficient to relieve the defendants from any further drilling operations.

Plaintiffs received over $136,000 in cash out of this lease, and if it is worth $250 an acre, as contended at the date plaintiffs assigned to defendants, the value of the 560 acres would be $140,000, so the plaintiffs have had nearly that sum out of it. The obligation to pay the additional $132,000 was, for the reasons stated, contingent and not absolute. That contingency was extremely remote.

It appears from the evidence that no benefit would have accrued to the plaintiffs by the further exploitation of the lease, which would only have imposed an unnecessary and useless burden upon the defendants. The parties were dealing with a very speculative subject. At the time the contract was entered into they could only hazard a guess as to whether the land contained any oil or gas, or how long it would be productive in the event of a discovery.

For these reasons we are of the opinion that the defendants, having developed the property in accordance with the contract, have violated no obligation, and that the lower court was in error in awarding damages, in effect, for failure to turn over the equipment. Even granting plaintiffs are entitled to the casing, and are damaged in that respect, there is no evidence separating the value of the casing from that of the other equipment. When the oil played out defendants offered to reassign the contract, but plaintiffs refused the offer, unless they were given personal property to the value of $34,000, to which they were not entitled.

So much of the judgment of the court below, adjudging that the plaintiffs below, Joseph W. Cline et al., recover from the defendants below, J. S. Cosden et al., the sum of $40,000, with interest, should be reversed, and so much of said judgment as was in favor of Cosden et al., defendants below, should be affirmed; and it is so ordered.